**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| RAMON LOPEZ,<br>*Plaintiff,*<br><br>v.<br><br>RYAN CAPEGA, *et al.*,<br>*Defendants*. | :<br>:<br>:<br>:<br>:<br>:<br>: | Case No. 3:24-CV-225 (SVN)<br><br><br><br><br><br>September 30, 2026 |

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

Plaintiff Ramon Lopez, a sentenced inmate currently incarcerated at Cheshire Correctional Institution ("Cheshire") within the Department of Correction ("DOC"), filed a *pro se* complaint under 42 U.S.C. § 1983, alleging primarily that various DOC employees were deliberately indifferent to his medical needs after Plaintiff suffered injuries when a transport van in which he was a passenger collided with a dumpster. *See* Compl., ECF No. 1. Defendants Officer Ryan Capega, Nurse Sandra Ortiz, Nurse Ama Serwah-Konadu, and Nurse Debra Cruz have moved for summary judgment. Mot. Summ. J., ECF No. 113. Plaintiff opposes the motion, *see* Pl.'s Opp., ECR No. 129, and the parties have filed replies, sur-replies, and sur-sur replies. *See* Defs.' Reply, ECF No. 132; Pl.'s Sur-Reply, ECF No. 150; Defs.' Sur-Sur-Reply, ECF No. 154.

Because no reasonable jury could conclude that Defendants violated Plaintiff's constitutional rights, Defendants' motion for summary judgment is **GRANTED**.

## I. PROCEDURAL BACKGROUND

The Court reviewed Plaintiff's complaint under 28 U.S.C. § 1915A(a). *See* Initial Rev. Order ("IRO"), ECF No. 11 at 2. After doing so, the Court permitted Plaintiff to proceed with his individual and official capacity claims for deliberate indifference to serious medical needs against Officer Capega, Nurse Ortiz, Nurse Serwah-Konadu, and Nurse Cruz, and with his individual

capacity claim for retaliation against Nurse Cruz. *Id.* at 17. The Court dismissed all other claims. *See id.* The Court required Plaintiff to file an amended complaint or a notice indicating that he wished to proceed on the plausible claims discussed in the IRO, and he opted to proceed on those claims instead of filing an amended complaint. *See* Not., ECF No. 12.

Defendants have now moved for summary judgment on all remaining claims. Defendants argue: (1) that they did not commit any Eighth Amendment violations and are protected by qualified immunity; (2) that any official capacity claims for damages against the Defendants are barred under the Eleventh Amendment; (3) that the official capacity injunctive claims remaining in this case must be rejected because none of the Defendants has the power to order the medical care that the Plaintiff seeks; and (4) that the record is insufficient to show a genuine dispute of material fact concerning whether Defendant Cruz retaliated against Plaintiff. *See* ECF No. 113-1 at 1.

Because the Court agrees with Defendants that Plaintiff's claims fail on the merits and that Defendants are entitled to qualified immunity, the Court grants summary judgment in favor of Defendants on these grounds without considering Defendants' second and third arguments.

## II. FACTUAL BACKGROUND

The following facts are taken from Defendants' Local Rule 56(a)1 statement, the statement of additional material facts contained in Plaintiff's Local Rule 56(a)2 statement, the exhibits supporting these statements, and Plaintiff's verified complaint. *See Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) ("A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit" described in Rule 56(c)(4)) (internal quotation marks and citation omitted)). The facts described below are undisputed unless

otherwise noted, but the Court generally cites to Defendants' Local Rule 56(a)1 Statement, as Plaintiff failed to comply with the requirement that his Local Rule 56(a)2 Statement reproduce each statement of fact in the Local Rule 56(a)1 Statement before stating whether the fact is admitted or denied. *See generally* Pl.'s L.R. 56(a)2 St., ECF No. 128.

A. The Accident

Plaintiff, who was a sentenced inmate at the relevant time, was scheduled to attend a medical appointment at the University of Connecticut's Medical Center ("UConn") in Farmington, Connecticut, on January 4, 2023. Defs.' L.R. 56(a)1 St., ECF No. 114 ¶¶ 1–2. Officer Capega, a correctional officer in the Correctional Transportation Unit ("CTU"), was assigned to transport inmates from Cheshire to UConn on that date in a CTU van. *Id.* ¶ 3; Capega Decl., ECF No. 113-4 ¶¶ 2, 7. Plaintiff and two other inmates were to be transported. Pl.'s Decl., ECF No. 129-1 at 6 ¶ 9.

Officer Capega arrived at the Cheshire exterior gate in a CTU van at approximately 6:10 a.m. ECF No. 114 ¶ 3. Surveillance video from Cheshire shows that it was still dark when Officer Capega arrived at the exterior gate. *See* Video 1, 11:03. Officer Capega drove the CTU van through the exterior gate towards the brightly-lit sallyport on prison grounds. *See* ECF No. 114 ¶ 4. Officer Capega proceeded through the sallyport towards Cheshire's Admitting and Processing ("A/P") area. *Id.* ¶ 5.

The inmates boarded the CTU van, secured in transport restraints. ECF No. 113-4 ¶ 22; ECF No. 129-1 at 47 ¶ 3. The transport restraints included a "belly chain that ha[d] two separate handcuffs" and "leg iron restraints." ECF No. 113-4 ¶ 22. The parties dispute whether Officer Capega secured the inmates with seatbelts in the CTU van. *Compare id.* ¶ 23 (stating that "the inmates' seatbelts were buckled"), *with* ECF No. 129-1 at 7 ¶ 11 (stating that "[n]one of the

inmates, including [Plaintiff], was secured utilizing seatbelts or any other safety restraints").

While reversing the CTU van, Officer Capega made contact with a dumpster. ECF No. 114 ¶ 8. The parties dispute the speed at which the van was traveling when it hit the dumpster. *Compare* ECF No. 113-4 ¶ 28 (Officer Capega describing the accident as "slow-speed contact"); *with* ECF No. 129-1 at 7 ¶ 12 (Plaintiff describing Officer Capega as "rapidly revers[ing]" the van). Plaintiff contends that he was "thrown forcefully forward" upon impact and fell from his seat, and could not brace himself due to the nature of the transport restraints. ECF No. 129-1 at 7 ¶¶ 13–14. Plaintiff immediately began to experience pain in his back, head, neck, and shoulder areas "from the whiplash effect of the accident." *Id.* ¶ 15.

The parties dispute Officer Capega's reaction after the accident. *Compare* ECF No. 113-4 ¶ 28 (Capega contending that he asked the passengers if they were okay and that they answered in the affirmative) *with* ECF No. 129-1 at 8, ¶¶ 16–17 (Plaintiff stating that Plaintiff and the other inmates yelled that they were injured, but Officer Capega continued to drive). One of the other inmates, Jerry Barron, corroborates Plaintiff's view, stating that he "and the other inmates in the van immediately began yelling to the driver that [they] had been injured and that [they] were in pain because of the accident." Barron Aff., ECF No. 129-1 at 51 ¶ 4. Both inmates assert that Officer Capega drove towards the back gate after the collision without acknowledging the inmates' injuries or pain. *See* ECF No. 129-1 at 8 ¶ 17; ECF No. 129-1 at 51 ¶ 5.

Officer Capega drove towards the sallyport area to assess the damage to the CTU van and call his supervisor, Lieutenant Rodriguez. ECF No. 114 ¶ 15. Officer Capega attests that he chose to do this in the sallyport area, as opposed to the A/P area, because the sallyport area had better lighting and cell phone reception. ECF No. 113-4 ¶ 29. Officer Capega arrived at the sallyport gates to inspect the damage to the CTU van approximately eleven minutes after driving through

the sallyport gates to pick up the inmates. *Compare* Video 2, 14:32 (showing the van leaving the sallyport gates), *with id.* 25:42 (showing it arriving back at the sallyport gates). The CTU van's bumper was dented. ECF No. 114 ¶ 10. Officer Capega then called Lieutenant Rodriguez. *Id.* ¶ 15.

Officer Capega spoke to Lieutenant Rodriguez for "perhaps less than five minutes." *Id.* On that phone call, Officer Capega asked Lieutenant Rodriguez about the proper next steps he should take in the situation. *Id.* Lieutenant Rodriguez advised Officer Capega that he should ensure that the inmate-passengers were "assessed by DOC medical before he proceeded on his planned trip to the hospital." *Id.* ¶ 16. Plaintiff overheard Officer Capega tell Lieutenant Rodriguez that, "'I don't want to go back into the facility'" and that, "'no, I didn't do any paperwork.'" ECF No. 129-1 at 47–48 ¶ 10. Plaintiff also overheard Officer Capega tell Lieutenant Rodriguez that "he had struck something while leaving and that the inmates in the van were complaining about pain." *Id.* at 8 ¶ 19.

Officer Capega then drove back to the A/P area to have the inmates assessed by medical staff before transporting them to UConn. ECF No. 114 ¶ 17. Officer Capega returned to the A/P area less than four minutes after arriving at the sallyport gates to inspect the damage to the CTU van. *Compare* Video 2, 25:42 (arriving at sallyport gates to inspect damage and call Lieutenant Rodriguez), *with id.* 29:10 (driving back towards A/P area).

B. Initial Medical Evaluation

Once Officer Capega arrived back at the A/P area, Officer Capega escorted the inmates out of the CTU van and took them to the A/P room to receive medical attention. ECF No. 114 ¶ 17. Two nurses, Defendants Serwah-Konadu and Ortiz, evaluated Plaintiff. *Id.* ¶ 19. Nurse Serwah-Konadu served as the "lead," while Nurse Ortiz followed her directions. Serwah-Konadu Decl.,

ECF No. 113-8 ¶ 9.

Nurse Serwah-Konadu visually assessed all three inmates, ECF No. 114 ¶ 21, who were still in transport restraints. ECF No. 128 ¶ 114. Nurse Serwah-Konadu asked the inmates "how they felt" and "attempted to gather the vital signs of the three inmates, including [Plaintiff], and recorded the results into the electronic health records." Serwah-Konadu Decl., ECF No. 113-8 ¶ 11. Plaintiff maintains that he had his temperature and blood oxygen levels checked, ECF No. 129-1 at 11 ¶ 31, and Nurse Ortiz recorded that Plaintiff "refused to have his blood pressure checked[.]" Ortiz Decl., ECF No. 113-9 ¶ 11. Plaintiff now denies that his blood pressure was checked, ECF No. 128 ¶ 25, although he had alleged in his complaint that he "had his blood pressure checked," *see* ECF No. 1 ¶ 55. Nurse Ortiz recorded that Plaintiff's pulse rhythm was regular, that his breathing was unlabored, and that his body temperature was 98.3 degrees. ECF No. 114 ¶ 26.[1]

Plaintiff complained of neck, shoulder, and back pain, nausea, and, according to Plaintiff, dizziness. ECF No. 114 ¶ 24; ECF No. 128 ¶ 24. Nurse Serwah-Konadu attests that Plaintiff "never declared" that he was in agonizing or debilitating or unbearable or any such severe pain" during the assessment. ECF No. 113-8 ¶ 17. She further attests that Plaintiff was able to "stand unassisted," his "presentation and speech were clear and cogent," and Plaintiff "appeared to understand what [Nurse Serwah-Konadu] was saying without any difficulty in comprehension." *Id.* ¶¶ 18–19; *see also* ECF No. 114 ¶ 23; ECF No. 128 ¶ 23 (noting Plaintiff was "made to stand but had primary and secondary medical symptoms").

Nurse Serwah-Konadu found it unnecessary to call an ambulance because Plaintiff "did

[1] Plaintiff neither admits nor denies the "vital statistics," instead speculating that "the defendants have illustrated a propensity to falsify paperwork in order to cover their own misconduct, rendering otherwise potentially accurate information unreliable." ECF No. 128 ¶ 26. As Plaintiff does not offer evidence to support any denial of the fact, the Court treats it as undisputed.

not present any significant risk factors that would denote his case as critical or as an emergency such that immediate medical attention and/or ambulance transport w[ould] be needed." *Id.* ¶ 22; *see also* ECF No. 114 ¶ 20. Nurse Serwah-Konadu assessed that Plaintiff was fit to travel to UConn Medical Center. ECF No. 114 ¶ 27. Although Defendants contend that Nurse Serwah-Konadu also placed Plaintiff "on the shift report for a DOC medical doctor to follow up on his case upon his return from the UConn Medical Center," Plaintiff disputes that she played any role in ensuring he received "any form of care at UCONN" or "upon returning to . . . Cheshire." ECF No. 114 ¶ 28; ECF No. 128 ¶ 28. Plaintiff avers he told Nurse Ortiz that he did not feel comfortable traveling to UConn with Officer Capega, but Nurse Ortiz told him that if he wished to receive further medical treatment, he would have to go in the van "because no one was calling an ambulance." ECF No. 129-1 at 11 ¶¶ 34–35.

Colleen Gallagher, a "district-level administrator" in DOC's "central office," later determined that the charts from Nurses Ortiz and Serwah-Konadu's evaluation of Plaintiff after the collision "appeared to be lacking the accompanying assessment note to the incident assessment forms which would provide the details of the encounter and any procedural protocol followed" and "did not have clearance boxes marked," which relate to clearing an inmate for travel to a hospital. Gallagher Decl., ECF No. 113-7 ¶¶ 2, 7, 13; *see also id.* at 10 (Gallagher's report); ECF No 114 ¶ 30; ECF No. 129-2 at 5 (nurses' charts, submitted by Plaintiff).

C. <u>UConn Visit</u>

Once Officer Capega learned that the inmates had been "cleared" to travel to UConn, Officer Capega assisted the inmates into the transport van. ECF No. 113-4 ¶ 35; ECF No. 128 ¶ 32. Officer Capega then drove Plaintiff and the other inmates to UConn at 6:55 a.m. ECF No. 114 ¶ 33; ECF No. 113-4 ¶ 41 (stating that Officer Capega reported leaving Cheshire at 6:55 a.m.).

Plaintiff attests that Officer Capega again did not place any form of safety restraints on him or the other inmates. ECF No. 129-1 at 12 ¶ 38. During the transport to UConn, the inmates told Officer Capega "that [they] were in pain and not feeling right after the incident." ECF No. 129-1 at 48 ¶ 15. Officer Capega ignored the inmates. *Id.*

Plaintiff's scheduled appointment at UConn was with the gastroenterology department. ECF No. 114 ¶ 35. Once Plaintiff arrived at UConn, he advised "duty staff" that the "CTU van had gotten into an accident and that [Plaintiff] was having neck, back, head, and shoulder pain, as well as being nauseous." ECF No. 129-1 at 48 ¶ 16. Plaintiff also vomited "several times." *Id.* ¶ 19. Plaintiff was directed to the emergency room for assessment. ECF No. 114 ¶ 35.

UConn medical records from Plaintiff's emergency room visit show that Plaintiff "present[ed] [to] the emergency department complaining of headache, neck pain, nausea, vomiting and back pain after low-speed M[otor] V[ehicle] C[rash.]" Med. Records, ECF No. 123-1 at 39. In the emergency room, Plaintiff underwent a CT scan of his head and neck and an X-ray of his lumbar and thoracic spine. ECF No. 114 ¶ 36. The CT and X-ray results showed "no acute findings." *Id.* Plaintiff received pain medication and was diagnosed with neck strain, or acute cervical strain. ECF No. 114 ¶ 36.

According to Plaintiff, after remaining in the emergency room for four to five hours, ECF No. 129-1 at 48 ¶ 20, Plaintiff was discharged to DOC custody, ECF No. 114 ¶ 38, and transported back to Cheshire by a different correctional officer. *Id.* ¶ 34. Non-party Nurse Degennaro evaluated Plaintiff after he arrived at Cheshire. ECF No. 123-1 at 56. At this evaluation, Nurse Degennaro documented that Plaintiff said "just put down that my pain is a 10," and advised Plaintiff to continue taking Aleve and Tylenol, as prescribed. *Id.* Plaintiff states that, at this visit, he complained of "ongoing pain, nausea, and discomfort" from the CTU van collision. ECF No.

129-1 at 13 ¶ 42.

D. Follow-Up Care

The day after the CTU van collision, Plaintiff complained to correctional officers of pain and nausea. *Id.* at 13–14 ¶ 43. A correctional officer called a doctor. *Id.* Non-party Dr. Williams saw Plaintiff shortly thereafter and prescribed Plaintiff medication for nausea and dizziness and over-the-counter pain medication. *Id.* Plaintiff "continued experiencing pain and discomfort in [his] neck, back, and shoulder areas weeks after the crash[.]" *Id.* at 14 ¶ 44. In late January of 2023, Dr. Williams put in a referral for Plaintiff to receive additional follow-up, to include orthopedic consultation and an MRI. *Id.* at 14 ¶ 45. These types of follow-up appointments must be approved by a "utilization review committee (URC)" process prior to approval. *Id.* ¶ 46. Plaintiff requested that Dr. Williams "begin the URC process for additional specialized care to address his headaches/dizziness and shoulder pain." *Id.* at 15 ¶ 49. Dr. Williams told Plaintiff that "he would have to continue pursuing additional medical care" by filing an HSAR grievance. *Id.* ¶ 50.

Medical records from March 1, 2023, show that an on-site orthopedic referral was in place for Plaintiff on that date. ECF No. 123 at 103. Medical records from March 28, 2023, and May 15, 2023, likewise show that Plaintiff was "on the list to see the on-site orthopedic surgeon." *Id.* at 62, 85. Plaintiff underwent an MRI for his shoulder at UConn on July 31, 2023. ECF No. 129-2 at 31. The MRI showed "interstitial tearing of the supraspinatus and full thickness tearing of the subscapularis." ECF No. 129-2 at 21. Plaintiff's torn tendons in his shoulder "significantly reduced" his range of motion, caused a loss of sensation and use of Plaintiff's right arm, and resulted in Plaintiff experiencing general pain and discomfort radiating through his shoulder, back, arm, and neck. ECF No. 129-1 at 16–17 ¶ 61.

An orthopedic surgeon saw Plaintiff on November 24, 2023. *See* ECF No. 129-2 at 26–27. Medical records from that visit show that Plaintiff was "interested in proceeding with surgery" and that medical staff would "plan for operative intervention for a rotator cuff repair." *Id*. Plaintiff was to "[r]eturn in about 3 months (around 2/24/2024)." *Id.* at 27.

Plaintiff saw DOC medical staff on April 22, 2024, for a "pre-op evaluation for right rotator cuff repair." ECF No. 129-2 at 38 (caps omitted). Plaintiff underwent shoulder surgery on May 7, 2024. ECF No. 129-1 at 35, 41. The surgery left Plaintiff in additional pain and required rehabilitation and physical therapy. ECF No. 129-1 at 17 ¶ 61. Plaintiff received post-operative medical care after surgery. *See* ECF No. 129-1 at 35, 38; ECF No. 129-2 at 34 (noting that orthopedics and physical therapy reported Plaintiff was "doing well, doesn't need to return").

E. Grievances

After returning to Cheshire on January 4, 2023, Plaintiff submitted two Inmate Request Form grievances. Cruz Decl., ECF No. 113-10 at 21–22. Submitting an inmate request form is a prerequisite to submitting a Health Services Administrative Remedy ("HSAR") grievance related to medical care. *See id.* at 13 (Administrative Directive 8.9(6)(b)(iii)(2), eff. April 30, 2021). Inmates may submit an HSAR grievance to seek review of "diagnosis or treatment decision[s]" or "practice[s], procedure[s], administrative provision[s] or policy, or an allegation of improper conduct by a health services provider." *Id.* at 12 (Administrative Directive 8.9(6)(a)).

Nurse Cruz was the Head Nurse and HSAR Coordinator at Cheshire in 2023. Cruz Decl., ECF No. 113-10 ¶¶ 3–4. As the HSAR Coordinator at Cheshire, Nurse Cruz was responsible for reviewing HSAR grievances, logging the requests into the "HS[A]R log," and either responding to the requests or forwarding them to the appropriate person for response." *Id.* ¶ 7. Nurse Cruz

replied to one of Plaintiff's two inmate requests five days after Plaintiff submitted it. ECF No. 113-10 at 21.

The record contains an HSAR Level 1 grievance dated January 28, 2023, that is not reflected on Plaintiff's grievance log. ECF No. 113-10 at 17, 19–20. This grievance is blank in the areas where prison staff would have indicated that it was received. *Id.* at 20. Plaintiff did not receive a response to this Level 1 grievance. ECF No. 129-1 ¶ 53. Nurse Cruz told Plaintiff that she "never received" the January 2023 Level 1 grievance. ECF No. 129-1 at 15–16 ¶ 54. Nurse Cruz also told Plaintiff that he "would have to begin the whole process again." ECF No. 129-1 at 15–16 ¶ 54. When Plaintiff "requested assistance from unit staff" (presumably to re-file an HSAR grievance), Nurse Cruz "responded to staff that she would not permit the plaintiff to file his HS[A]R," that "it[']s likely that another nurse 'threw out' the HS[A]R," and that "nobody cares (about [Plaintiff's] treatment)." *Id.* at 16 ¶ 55. Plaintiff avers that Nurse Cruz told Plaintiff that he was "'not going to win [his] grievance' and it was 'tough' that [he] wasn't getting treatment." *Id.* ¶ 57.

Prison grievance records show that Plaintiff filed two HSAR grievances between December of 2022 and September of 2024. *See* ECF No. 113-10 at 16–17. First, Plaintiff filed an HSAR Level 2 grievance ("first HSAR grievance") dated March 13, 2023, related to the vehicle collision, the "subsequent inadequate treatment" by Nurses Ortiz and Serwah-Konadu, and "ongoing inadequate medical treatment that caused [him] to continue to be in pain." ECF No. 129-1 at 15 ¶ 51; ECF No. 113-10 at 17 (grievance log showing receipt of this grievance on March 16, 2023); *id.* at 19 (Level 2 grievance). Staff rejected the appeal because they never received a Level 1 HSAR grievance related to this appeal. *See* ECF No. 113-10 at 18.

Plaintiff filed a second Level 1 HSAR grievance on July 20, 2023. *See* ECF No. 113-10 at 27. Prison officials received the second HSAR grievance on July 24, 2023. *See id.* at 17. The second HSAR grievance pertained to medical staff's failure to process the first HSAR grievance and did not contain a request for additional medical care. *See id*. at 27. On August 3, 2023, a prison official responded to Plaintiff's second HSAR grievance, stating, in relevant part, that "[t]he process has been reviewed and adjusted by medical for transparency/accountability when remedies are collected from the units." *Id.* at 29. The response did not mention any medical treatment Plaintiff had received or would be receiving in the future. *See id.* The same day, Plaintiff filed an appeal inquiring whether he will be treated for his injuries sustained on January 4, 2023, and whether his concerns were addressed. *Id.* at 25. Plaintiff did not mention any medical treatment he had received or that he expected to receive in the future. *See id.*

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial. It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 324). The non-moving party, in order to defeat summary judgment, must come forward with specific evidence—beyond "conclusory allegations or unsubstantiated speculation"—that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249; *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

Moreover, the Court bears in mind that a *pro se* litigant's filings must be liberally construed to raise the strongest arguments they suggest. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007);

*Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013); *see also Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010) (collecting cases regarding the "special solicitude" afforded to *pro se* litigants).

## III. DISCUSSION

Defendants argue that they are entitled to summary judgment because, among other reasons, Plaintiff's claims fail on the merits and they are entitled to qualified immunity. The Court agrees with both arguments.

### A. Eighth Amendment Deliberate Indifference to Serious Medical Needs Claims

First, the Court concludes that there are no genuine disputes of fact with respect to Plaintiff's Eighth Amendment deliberate indifference claim.

The Court permitted Plaintiff to proceed with his individual and official capacity claims for deliberate indifference to serious medical needs against Officer Capega, Nurse Ortiz, Nurse Serwah-Konadu, and Nurse Cruz. IRO, ECF No. 11 at 17. The Court need not, and does not, address whether Officer Capega was deliberately indifferent to Plaintiff's safety when driving the CTU van because the Court did not permit such a claim to proceed against Officer Capega. *See id.* Accordingly, the Court considers only whether any individual defendant was deliberately indifferent to Plaintiff's serious medical needs arising after the vehicle collision.

The Eighth Amendment forbids deliberate indifference to prisoners' serious medical needs. *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013). To state a claim for deliberate indifference to serious medical needs, the prisoner must allege facts satisfying two elements, one objective and one subjective. *See id.*

The objective element requires the prisoner to demonstrate that the alleged deprivation of medical care was "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). This objective showing in turn requires a court to make two inquiries.

*See Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), *abrogated on other grounds as recognized by Kravitz v. Purcell*, 87 F.4th 111, 119, 122 (2d Cir. 2023).

First, the Court must determine whether the inmate was "actually deprived of adequate medical care." *Id.* at 279. A "prison official's duty is only to provide reasonable care." *Id.* So, "prison officials who act reasonably in response to an inmate-health risk cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability[.]" *Id.* at 279–80 (cleaned up) (quoting *Farmer*, 511 U.S. at 844–47).

Second, the Court must determine "whether the inadequacy in medical care is sufficiently serious." *Salahuddin*, 467 F.3d at 280. Determining whether an "inadequacy in medical care is sufficiently serious," *id.*, depends on whether the issue is a failure to provide any medical treatment, inadequate treatment, or delayed treatment. *See Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003). Thus, this inquiry is necessarily contextual and fact-specific. *Id.* at 185.

"[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Salahuddin*, 467 F.3d at 280 (citing *Smith*, 316 F.3d at 185–86). "Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Id.* (cleaned up) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

If treatment is given but the inmate alleges it is inadequate, "the seriousness inquiry is narrower." *Id.* In such cases, the Court focuses on the "inadequacy itself." *Valdiviezo v. Boyer*, 752 F. App'x 29, 32 (2d Cir. 2018) (summary order); *see also Robbs v. McCrystal*, No. 3:20-CV-

01584 (MEG), 2023 WL 2526533, at *9 (D. Conn. Mar. 15, 2023) ("[i]f the prisoner is receiving treatment and the conduct at issue is . . . a challenge to the kind of treatment received, the seriousness inquiry focuses on the challenged . . . treatment 'rather than the prisoner's underlying medical condition alone'") (quoting *Smith*, 316 F.3d at 185). In doing so, courts consider "what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280.

If the inmate alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* . . . rather than the prisoner's *underlying medical condition* alone" to determine whether the deprivation is objectively sufficiently serious. *Smith*, 316 F.3d at 185 (emphasis in original). "In considering whether a delay caused a risk of harm, a court may consider 'the absence of adverse medical effects or demonstrable physical injury.'" *Valdiviezo*, 752 F. App'x at 32 (brackets omitted) (quoting *Smith*, 316 F.3d at 187). If a plaintiff's medical condition was not aggravated by the delay, a plaintiff cannot satisfy the objective element. *See*, *e.g.*, *id.* (holding that district court properly dismissed plaintiff's claim based on a denial of medical care because, "[a]lthough [plaintiff] alleged that he remained in pain during the hour-long wait, he d[id] not allege that the delay exacerbated his injuries from his initial fall"); *Bilal v. White*, 494 F. App'x 143, 146 (2d Cir. 2012) (summary order) (delay in treatment did not satisfy objective element because "there [wa]s no evidence that [plaintiff's] conditions worsened over the hours of delay here" (citing *Smith*, 316 F.3d at 187)).

As to the subjective element, "[a]n official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety,'" *Smith*, 316 F.3d at 184 (quoting *Chance,* 143 F.3d at 702), which is "a state of mind 'equivalent to the

familiar standard of recklessness' as used in criminal law." *Id.* (quoting *Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir. 2002) (*per curiam*)). Conduct may rise to the level of deliberate indifference when the prison official's act or failure to act "evinces 'a conscious disregard of a substantial risk of serious harm.'" *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (quoting *Farmer*, 511 U.S. at 839). In other words, the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Farmer*, 511 U.S. at 837).

"A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference[,] [n]or does the fact that an inmate might prefer an alternative treatment, or feels that he did not get the level of medical attention he preferred." *Young v. Choinski*, 15 F. Supp. 3d 172, 182–83 (D. Conn. 2014) (internal quotation marks omitted); *see also Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) ("It has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment . . . [T]he essential test is one of medical necessity and not one simply of desirability." (internal quotation marks and citation omitted)). "[M]ere allegations of negligent malpractice do not state a claim of deliberate indifference[,]" either. *Hathaway*, 99 F.3d at 553.

The Court examines the conduct of each Defendant in turn.

*1. Officer Capega*

Plaintiff asserts that Officer Capega was deliberately indifferent to Plaintiff's serious medical needs by failing to render medical aid to Plaintiff after the vehicle collision. *See* IRO, ECF No. 11 at 9. As Officer Capega is not a medical provider, to demonstrate an Eighth Amendment violation as to him, Plaintiff must prove that he "intentionally delayed access to medical care" when Plaintiff was "in extreme pain and ha[d] made his medical problems known."

*Roundtree v. City of New York*, No. 15-CV-8198, 2018 WL 1586473, at *6 (S.D.N.Y. Mar. 28, 2018) (internal quotation marks and citation omitted); *Mehalick v. Stowell*, No. 9:24-CV-775 (BKS/TWD), 2024 WL 4930660, at *7 (Dec. 2, 2024) (same).

As to the objective element of Plaintiff's deliberate indifference claim, a reasonable jury could conclude that Plaintiff was "actually deprived of adequate medical care" by Officer Capega when he drove towards the back gate after the collision without acknowledging Plaintiff's injuries or pain. *See Salahuddin*, 467 F.3d at 279; ECF No. 129-1 at 47 ¶ 9. Thus, the Court must next consider whether "the inadequacy in medical care is sufficiently serious." *Salahuddin*, 467 F.3d at 280. This depends, in turn, on whether Officer Capega provided any medical treatment, inadequate treatment, or delayed treatment. *See Smith*, 316 F.3d at 185–86.

Here, as "in certain cases[,] reasonable minds may disagree as to whether a case presents a delay or denial of treatment[.]" *Harding v. Canfield*, 610 F. Supp. 3d 495, 504 (W.D.N.Y. 2022) (citing *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000)). But courts in this district have concluded that if a defendant initially denies a plaintiff medical treatment but another medical professional eventually provides the plaintiff medical treatment, the defendant's initial denial of medical treatment constitutes a delay in treatment, rather than a denial of treatment. *See*, *e.g.*, *Burns v. Lupis*, No. 3:23-CV-23 (KAD), 2023 WL 1801704, *2, *4 (D. Conn. Feb. 7, 2023) (allegations that defendant-doctor denied a bottom bunk pass to an inmate with a torn meniscus "involve[d] a delay in treatment, as opposed to a denial of treatment" because another doctor later issued the inmate a lower bunk pass and prescribed ibuprofen for the inmate's knee).

When the record evidence is construed in the light most favorable to Plaintiff, a reasonable jury could conclude that Officer Capega initially denied medical treatment to the Plaintiff when he "proceeded to drive off towards the back gate, ignoring [the inmates'] collective pleas for

assistance," ECF No. 129-1 at 47 ¶ 9, just as the defendant-doctor in *Burns* initially denied medical treatment to the inmate by refusing to issue him a bottom bunk pass. *See Burns*, 2023 WL 1801704, at *2. But it is undisputed that Plaintiff eventually received medical treatment from Nurses Ortiz and Serwah-Konadu and UConn medical staff, just as the inmate in *Burns* eventually received a lower bunk pass and ibuprofen for his knee from another doctor. *See id*. Thus, Officer Capega's actions are best characterized as a delay in treatment, rather than a denial of treatment. *See id.* at *4. As such, "it is appropriate to focus on the effect of that challenged delay in treatment in determining whether the risk was objectively serious." *Alvarez v. Wright*, 797 F. App'x 576, 579 (2d Cir. 2019) (summary order) (citing *Smith*, 316 F.3d at 186).

Surveillance video from the sallyport shows that less than fifteen minutes elapsed between the time that Officer Capega initially entered the sallyport gates to pick up the inmates to the time he turned around from the sallyport gates to return the inmates to the A/P area for medical treatment after the collision. *Compare* Video 2, 14:32 (initially entering the sallyport gates before driving to A/P area), *with id.* 29:10 (driving back towards A/P area after collision). During that approximately fifteen-minute time frame, Officer Capega drove towards the A/P area, picked up the inmates, collided with the dumpster, and then drove towards the sallyport to assess the damage and call Lieutenant Rodriguez. *See* Capega Decl., ECF No. 113-4 ¶¶ 14, 22, 27, 29. Accounting for these intervening events, the delay in Officer Capega returning the inmates to the A/P area would have been considerably shorter than fifteen minutes. The record contains no evidence that Plaintiff's injuries worsened during this delay lasting fewer than fifteen minutes. Accordingly, no reasonable jury could find the objective element satisfied. *See Valdiviezo*, 752 F. App'x at 32; *Bilal*, 494 F. App'x at 146.

No reasonable jury could find the subjective element satisfied, either. "Although a delay in medical care can demonstrate deliberate indifference to a prisoner's medical needs, a prisoner's Eighth Amendment rights are violated only where the defendant 'knowingly or intentionally' delayed medical treatment." *Burns*, 2023 WL 1801704, at *4 (quoting *Jimenez v. Sommer*, No. 14-cv-5166 (NSR), 2017 WL 3268859, at *8 (S.D.N.Y. July 28, 2017)). As *Burns* notes, the Second Circuit has "reserved those instances to cases where prison officials deliberately delayed care as a form of punishment, ignored a life-threatening and fast-degenerating condition for three days[,] or delayed major surgery for over two years." *Id.* (cleaned up and citing *Jimenez*, 2017 WL 3268859, at *8); *see also Demata v. New York State Corr. Dep't of Health Servs.*, 198 F.3d 233, at *2 (2d Cir. 1999) (summary order) (citing *Archer v. Dutcher,* 733 F.2d 14, 16–17 (2d Cir. 1984) (punishment)); *Liscio v. Warren,* 901 F.2d 274, 276–77 (2d Cir. 1990) (life-threatening and fast-degenerating condition), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009)); *Hathaway v. Coughlin*, 841 F.2d 48, 50–51 (2d Cir. 1988) (two-year delay)).

"[A] number of courts, when confronted with delays of one day or less, have found no Eighth Amendment violation, emphasizing the brevity of the delay because it undercut the assertion that defendants were deliberately indifferent." *Laster v. Mancini*, No. 07 CIV. 8265 DAB, 2013 WL 5405468, at *22 (S.D.N.Y. Sept. 25, 2013) (collecting cases); *see also Washington v. Artus*, 708 F. App'x 705, 709 (2d Cir. 2017) (summary order) (affirming a district court's grant of summary judgment on a deliberate indifference claim where the plaintiff had argued that the defendants demonstrated deliberate indifference to his broken ankle "by allowing four hours to pass before transporting him to the emergency room").

The delay in Officer Capega delivering Plaintiff to medical staff did not exceed fifteen minutes, let alone hours or even a day. Courts have concluded that similarly brief delays are

insufficient to evince deliberate indifference. *See*, *e.g. Tatum v. City of New York*, No. 06-CV-4290 (BSJ) (GWG), 2009 WL 124881, at *5 (S.D.N.Y. Jan. 20, 2009) ("[W]aiting ten to twenty minutes before taking [plaintiff] to the infirmary" was not deliberate indifference under the Fourteenth Amendment); *Ravenell v. Van der Steeg*, No. 05 CIV 4042 WHP, 2007 WL 765716, at *4 (S.D.N.Y. Mar. 14, 2007) (a "15-20 minute[ ]" delay cannot constitute deliberate indifference "[a]s a matter of law"); *Lewis v. Sheridan*, No. 9:12-CV-31 GLS/DEP, 2014 WL 1096220, at *10–11 (N.D.N.Y. Mar. 19, 2014) (a "delay in contacting medical personnel for twenty-five minutes" was not deliberate indifference); *Mirvis v. Quay*, No. 19-CV-2573 (LDH) (VMS), 2025 WL 2782798, at *6 (E.D.N.Y. Sept. 30, 2025) (there was "no question" that a twenty-minute delay between when plaintiff informed defendants of his injury and when defendants sent plaintiff to medical department did not amount to deliberate indifference). Accordingly, the Court concludes that the brief delay in Officer Capega delivering Plaintiff to medical staff at the A/P room "undercut[s] the assertion" that Officer Capega was deliberately indifferent to Plaintiff's serious medical needs. *Laster*, 2013 WL 5405468, at *22.

But even setting aside the brevity of the delay, the record evidence, when viewed in the light most favorable to Plaintiff, does not suggest that Capega "knowingly or intentionally delayed medical treatment." *Burns*, 2023 WL 1801704, at *4 (internal quotation marks omitted). Although Plaintiff overheard Officer Capega tell Lieutenant Rodriguez that, "'I don't want to go back into the facility,'" after the collision, ECF No. 129-1 at 47–48 ¶ 10, Officer Capega did, in fact, return the inmates to the A/P room to have them assessed by medical staff immediately after Lieutenant Rodiguez instructed Officer Capega to do so.

Because Officer Capega ultimately brought Plaintiff to receive medical treatment in the A/P room (however lacking Plaintiff claims such treatment to have been), a reasonable jury could

not conclude that Officer Capega "possessed the culpable state of mind to satisfy the subjective standard of a deliberate indifference claim." *Benjamin v. Pillai*, 794 F. App'x 8, 13 (2d Cir. 2019) (summary order) (citing *Hathaway*, 99 F.3d at 553). Accordingly, no reasonable jury could find the subjective element satisfied. *See id.* (no reasonable jury could find that doctor was deliberately indifferent to inmate because doctor provided medical treatment to inmate); *see also Alvarez*, 797 F. App'x at 579 (same).

Because no reasonable jury could find either element satisfied, Officer Capega is entitled to summary judgment on the merits of the Eighth Amendment claim.

*2. Nurses Ortiz and Serwah-Konadu*

Likewise, the Court finds that there is no genuine dispute about whether Nurses Ortiz and Serwah-Konadu violated Plaintiff's Eighth Amendment rights.

Plaintiff asserts that Nurses Ortiz and Serwah-Konadu were deliberately indifferent to Plaintiff's serious medical needs by rendering inadequate medical care to Plaintiff after the vehicle collision. *See* IRO, ECF No. 11 at 9.

As to the objective element of Plaintiff's deliberate indifference claim, it is questionable whether a reasonable jury could conclude that Plaintiff was actually deprived of adequate medical care when Nurses Ortiz and Serwah-Konadu evaluated Plaintiff in the A/P room after the collision. *See Salahuddin*, 467 F.3d at 279. The evaluation of Plaintiff consisted of "visually assess[ing]" him, asking Plaintiff "how [he] felt," and "attempt[ing] to gather" Plaintiff's "vital signs . . . " Serwah-Konadu Decl., ECF No. 113-8 ¶ 11. The Second Circuit has held that plaintiffs who underwent similar examinations were not "actually deprived of adequate medical care." *Salahuddin*, 467 F.3d at 279; *see, e.g.*, *Davila v. UConn Med. Ctr.*, 353 F. App'x 490, 493 (2d Cir. 2009) (summary order) (concluding that plaintiff "failed to show that he was actually deprived of

adequate medical care" because even though defendants "failed to provide him, *inter alia,* medication to alleviate his chronic knee pain, the record shows that qualified physicians carefully examined [plaintiff] and concluded that this treatment was unnecessary given the condition of his knee and his overall health and mobility").

Nevertheless, the standard is "*adequate* medical care," *Salahuddin*, 467 F.3d at 279 (emphasis added), and it is plausible that a reasonable jury could conclude that the medical care provided by Nurses Ortiz and Serwah-Konadu was cursory and inadequate. *See Rivers v. Jun*, No. 18-CV-6898-FPG, 2022 WL 4922312, at *4 (W.D.N.Y. Oct. 4, 2022) ("While it cannot be disputed that Defendant provided some medical care throughout the relevant period, a reasonable jury could find that such care was so inadequate as to constitute a sufficiently serious deprivation."). Thus, the Court focuses on the "inadequacy itself." *Valdiviezo*, 752 F. App'x at 32. In considering the "inadequacy itself," *id.*, courts consider "what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280.

Although the record shows that Nurses Ortiz and Serwah-Konadu did not fill out the appropriate paperwork after evaluating Plaintiff, *see* Gallagher Decl., ECF No. 113-7 ¶ 13, the record contains no evidence suggesting that the method of evaluation (or lack thereof) caused Plaintiff any harm. *See Salahuddin*, 467 F.3d at 280. The results from the CT scan and X-ray examination at UConn showed no acute findings, ECF No. 114 ¶ 36, so Nurses Ortiz and Serwah-Konadu's evaluation of Plaintiff could not have aggravated injuries that were not "acute" hours later. *Id.* Because the record contains no evidence that inadequate medical treatment rendered by Nurses Ortiz and Serwah-Konadu caused any harm to Plaintiff, *see Salahuddin*, 467 F.3d at 280, no reasonable jury could find the objective element satisfied. *See, e.g.*, *Fox v. Fischer*, 242 F. App'x 759, 760 (2d Cir. 2007) (summary order) (concluding that medical staff's substitution of

medication did not satisfy the objective element because there was "no allegation that the change in medication caused harm, if any, sufficiently serious to establish the objective prong of a deliberate indifference claim[.]" (citing *Hathaway*, 99 F.3d at 553)).

No reasonable jury could find the subjective element satisfied, either. Plaintiff maintains in his response that "[n]o one could possibly assess the plaintiff's medical condition under these circumstances without the aid of medical technology[,] and the plaintiff should have been brought to such medical technology (*i.e.*, at an emergency room) via the most safe and expedient means (*i.e.*, an ambulance)." Pl.'s Opp. Br., ECF No. 129 at 7.

But the Supreme Court has held that "[a] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice[.]" *Estelle v. Gamble*, 429 U.S. 97, 107 (1976). Thus, the nurses' medical decision not to "br[ing] [Plaintiff] to such medical technology," ECF No. 129 at 7, does not evince deliberate indifference. *See Hathaway*, 99 F.3d at 553. Nor does the nurses' medical decision not to transport Plaintiff to the hospital—where he was already going anyway—in an ambulance, instead of a CTU van, evince deliberate indifference. *See*, *e.g.*, *Toliver v. New York*, No. 20-CV-0607, 2020 WL 6748847, at *3–4 (W.D.N.Y. Nov. 17, 2020) (concluding that allegations in "broad terms that the Defendants were aware of his injury and chose not to rush him to the hospital by ambulance, instead using prison vehicles and keeping Plaintiff shackled while awaiting transport and while being transported," were insufficient to plausibly suggest deliberate indifference to plaintiff's medical needs). Nurses Ortiz and Serwah-Konadu exercised their medical judgment to conclude that Plaintiff was not facing an emergency medical situation, and were not deliberately indifferent in allowing him to be transported to UConn via CTU transport van, rather than ambulance.

Because the record contains no evidence that Nurses Ortiz and Serwah-Konadu were deliberately indifferent to Plaintiff's serious medical needs, no reasonable jury could find the subjective element satisfied. At most, Plaintiff disagrees with their method of treatment, which does not amount to an Eighth Amendment violation. *See*, *e.g.*, *Swinton v. Livingston Cnty.*, No. 21-1434, 2023 WL 2317838, at *2 (2d Cir. Mar. 2, 2023) (summary order) (plaintiff's contention that doctors "should have provided [plaintiff] with a root-canal or an extraction to remedy his repeated abscessing" was a "mere disagreement over the proper course of treatment" that, "without more, does not evince a conscious disregard of a substantial risk of serious harm to [plaintiff's] health[.]" (cleaned up) (quoting *Darby v. Greenman*, 14 F.4th 124, 128 (2d Cir. 2021))).

As no reasonable jury could find either element of an Eighth Amendment violation satisfied, the Court grants summary judgment in favor of Nurses Ortiz and Serwah-Konadu on the merits.

*3. Nurse Cruz*

Further, no reasonable jury could find that Nurse Cruz violated Plaintiff's Eighth Amendment rights.

Plaintiff asserts that Nurse Cruz was deliberately indifferent to Plaintiff's serious medical needs because she delayed Plaintiff's medical care by refusing to accept his HSAR grievances. *See* IRO, ECF No. 11 at 10.

As to the objective element of Plaintiff's deliberate indifference claim, courts consider whether an inmate was "actually deprived of adequate medical care," *Salahuddin*, 467 F.3d at 279, by the *defendant*. *See*, *e.g.*, *Thomas v. Wolf*, 832 F. App'x 90, 92 (2d Cir. 2020) (summary order) (concluding that plaintiff failed to "satisfy the first, 'objective,' element" because the plaintiff did not allege facts from which the court could "infer that [*defendant*] acted unreasonably in treating

[plaintiff's] back pain." (emphasis added)). This comports with the "personal involvement" requirement for Section 1983 claims. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (noting that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (internal quotation marks and citation omitted)); *Roseboro v. Faucher*, No. 3:21-CV-569 (VAB), 2024 WL 5111860, at *5 (D. Conn. Dec. 13, 2024) ("Personal involvement means direct participation, such as 'personal participation by one who has knowledge of the facts that rendered the conduct illegal,' or indirect participation, such as 'ordering or helping others to do the unlawful acts.'" (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001))). As an initial matter, Nurse Cruz was not one of Plaintiff's medical providers with respect to the van collision (though she is an RN and Head Nurse). Her only involvement in Plaintiff's medical care was in her role as HSAR Coordinator. And in that role, no reasonable jury could conclude that she was deliberately indifferent to Plaintiff's serious medical needs.

In determining whether a genuine dispute of material fact exists as to whether Plaintiff was actually deprived of adequate medical care by Nurse Cruz, the Court consider Plaintiff's sworn allegations in his complaint and declaration. *See Gayle*, 313 F.3d at 682; *Barnes v. Fedele*, 813 F. App'x 696, 699 (2d Cir. 2020) (summary order) ("A party may submit affidavits and declarations in support of its motion for summary judgment, provided the statements included therein are 'made on personal knowledge' and 'set out facts that would be admissible in evidence.'" (quoting Fed. R. Civ. P. 56(c)(4))). But the Court must view Plaintiff's sworn allegations in the context of the record as a whole. *See Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transportation Auth.*, 11 F.4th 55, 61 (2d Cir. 2021) ("Summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." (cleaned up)). And if a plaintiff's sworn allegations are contradicted by undisputable evidence in the record, they may

not be sufficient to create a genuine dispute of material fact. *See Scott v. Harris,* 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Chimney v. Quiros*, No. 3:21-CV-00321 (JAM), 2023 WL 2043290, at *3 (D. Conn. Feb. 16, 2023) ("Multiple courts have declined at summary judgment to credit statements by a plaintiff that are flatly contradicted by contemporaneous medical records." (collecting cases)), *aff'd sub nom.*, *Chimney v. Feder*, No. 23-6478, 2025 WL 2629833 (2d Cir. Sept. 12, 2025).

Here, Plaintiff maintains in his complaint and declaration that "he would have to continue pursuing additional medical care" by filing an HSAR grievance, but that Nurse Cruz told "staff that she would not permit the plaintiff to file his HS[A]R" grievance. ECF No. 1 ¶¶ 84, 89; *see also* ECF No. 129-1 at 15–16 ¶¶ 50, 55. The Court permitted Plaintiff to pursue his deliberate indifference claim against Nurse Cruz because it inferred from these allegations that, by refusing HSAR grievances that Plaintiff needed to file to obtain treatment for his shoulder, "Nurse Cruz appears to have understood Plaintiff's need for treatment but acted to deny that treatment[.]" IRO, ECF No. 11 at 10–11. But when Plaintiff's sworn allegations are viewed against the full record on summary judgment, no reasonable jury could draw the same inference that the Court generously drew in its initial review order, when it was considering whether the complaint was frivolous. *See* 28 U.S.C. § 1915A(b).

First, the record evidence contradicts Plaintiff's sworn allegations suggesting that filing an HSAR grievance was necessary to obtain the specialized medical care that Plaintiff sought. Medical staff did not receive Plaintiff's first HSAR grievance dated January 28, 2023. *See* ECF No. 129-1 at 15 ¶ 54; ECF No. 113-10 at 19–20 (copy of first HSAR grievance showing it was not

received). Medical staff first received an HSAR grievance from Plaintiff on March 16, 2023. *See* ECF No. 113-10 at 17. But even before staff received this March 2023 grievance, DOC records documenting a medical visit on March 1, 2023, showed that an "[o]n-site orthopedic referral [wa]s in place…." ECF No. 123 at 103. That Plaintiff received an orthopedic referral before filing an HSAR grievance contradicts Plaintiff's allegations suggesting that filing an HSAR grievance was necessary to obtain specialized treatment for his shoulder. Likewise, months before Plaintiff filed his second HSAR grievance on July 20, 2023, he had already been "on the list to see the on-site orthopedic surgeon." ECF No. 123 at 62, 85; ECF No. 113-10 at 27.

Medical staff received Plaintiff's second HSAR grievance a few days after he filed it. *See* ECF No. 113-10 at 17, 27. But before staff responded to the second HSAR grievance on August 3, 2023, Plaintiff underwent an MRI for his shoulder at UConn on July 31, 2023. ECF No. 129-2 at 31; ECF No. 113-10 at 29. That Plaintiff was on the list to see the on-site orthopedic surgeon and received an MRI before medical staff responded to the only grievance that they had received also contradicts Plaintiff's allegations suggesting that filing an HSAR grievance was necessary to obtain specialized treatment for his shoulder. Moreover, the response to Plaintiff's second HSAR grievance and his subsequent appeal did not mention any past or future treatment, again contradicting Plaintiff's allegations that filing an HSAR grievance was necessary to obtain specialized treatment for his shoulder. Thus, when the record is viewed as a whole, no reasonable jury could conclude that filing an HSAR grievance was necessary to obtain the specialized medical care that Plaintiff sought, as Plaintiff contends.

Because obtaining the specialized medical care that Plaintiff sought did not hinge on filing an HSAR grievance, Nurse Cruz's purported refusal to accept Plaintiff's HSAR grievances did not present any barrier to Plaintiff receiving that medical treatment. Thus, Plaintiff's allegations

against Nurse Cruz would amount to nothing more than a claim that Nurse Cruz improperly handled Plaintiff's HSAR grievances, which is not actionable. *See Tafari v. McCarthy*, 714 F. Supp. 2d 317, 360 (N.D.N.Y. 2010) (noting that "the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." (internal quotation marks and citation omitted)); *see also Linarte v. Furey*, No. 3:19-CV-435 (MPS), 2019 WL 1644236, at *3 (D. Conn. Apr. 16, 2019) (concluding that "inmates have no constitutional entitlement to a grievance procedure, to receive a response to a grievance, or to have the grievance processed properly" and collecting cases).

For these reasons, Plaintiff's sworn allegations suggesting that Nurse Cruz delayed or denied specialized medical care for Plaintiff's shoulder by refusing to accept his HSAR grievance are not only "unsupported by evidence of any weight," *Smith*, 853 F.2d at 155—they are contradicted by other record evidence. As such, the Court need not credit such allegations in determining whether a material issue of fact exists as to the objective element. *See Scott,* 550 U.S. at 380; *Chimney*, 2023 WL 2043290, at *3.

In the absence of any evidence other than Plaintiff's unsupported and contradicted allegations, a reasonable jury could not conclude that Plaintiff was actually deprived of adequate medical care by Nurse Cruz. *See Salahuddin*, 467 F.3d at 279. As such, Nurse Cruz is entitled to summary judgment on the merits of the Eighth Amendment claim. *Davila*, 353 F. App'x at 493 (affirming summary judgment on deliberate indifference claim because plaintiff "failed to show that he was actually deprived of adequate medical care" by defendants).

B. Retaliation Claim Against Nurse Cruz

Finally, there are no genuine disputes of material fact concerning Plaintiff's First Amendment retaliation claim against Nurse Cruz.

Plaintiff asserts that Nurse Cruz delayed Plaintiff's specialized medical care by refusing to accept his HSAR grievances in retaliation for Plaintiff utilizing the administrative remedy system. *See* IRO, ECF No. 11 at 12.

The Second Circuit has "instructed district courts to approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)). Thus, retaliation claims "stated in wholly conclusory terms" are insufficient. *Id.* (internal quotation marks and citations omitted).

To plead a First Amendment retaliation claim, an inmate must plausibly allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Id.* at 294 (internal quotation marks and citation omitted). "[T]he filing of a lawsuit or a grievance is protected conduct." *Walker v. Senecal*, 130 F.4th 291, 298 (2d Cir. 2025). "An adverse action is defined as 'retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (quoting *Davis*, 320 F.3d at 353).

And to allege causation, a plaintiff must demonstrate that the protected conduct was a but-for cause of the adverse action, meaning that the action "would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019). An inmate may establish that causal connection by "showing that protected activity was close in time to the adverse action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). But "[i]n the context of prisoner retaliation

claims, [the Second Circuit] ha[s] required evidence beyond temporal proximity between the protected activity and the adverse action before allowing a prisoner to proceed to trial on such a claim." *Davis v. Florence*, 600 F. App'x 26, 27 (2d Cir. 2015) (summary order) (citing *Colon v. Coughlin,* 58 F.3d 865, 872–73 (2d Cir. 1995)).

Here, a reasonable jury could find that Plaintiff satisfied the first element by filing HSAR grievances. *See* ECF No. 113-10 at 19 (first HSAR grievance); *id.* at 27 (second HSAR grievance); *see also Walker*, 130 F.4th at 298.

As to the second element, although "the denial of medical treatment for a period of time may be considered adverse action," *Conquistador v. Cook*, No. 3:19-CV-1471 (KAD), 2020 WL 4586513, at *4 (D. Conn. Aug. 10, 2020), the Court has found above that no reasonable jury could conclude Nurse Cruz delayed or denied Plaintiff specialized medical care.

Finally, no reasonable jury could find the third element—"that there was a causal connection between the protected speech and the adverse action," *Dolan*, 794 F.3d at 294 (internal quotation marks and citation omitted)—satisfied based on the record evidence before the Court. The undisputed evidence shows that Nurse Cruz told Plaintiff that she never received the January 23, 2023, HSAR grievance he claims to have filed. *See* ECF No. 129-1 at 15 ¶ 54. Nurse Cruz's statements are corroborated by the January grievance itself, which bears no indication that medical staff received it. *See* ECF No. 113-10 at 20. No reasonable jury could conclude that Nurse Cruz denied Plaintiff medical care based on Plaintiff filing an HSAR grievance that Nurse Cruz never received. *See*, *e.g. Adams v. Rock*, No. 9:12-CV-1400 GLS/ATB, 2015 WL 1312738, at *12 (N.D.N.Y. Mar. 24, 2015) ("Obviously, there could be no causal connection between plaintiff's grievance and the misbehavior report if the defendants were not aware of the grievance when they initiated disciplinary charges.").

Nurse Cruz did receive and respond to an "Inmate Request Form" that Plaintiff filed the day after the vehicle collision. *See* ECF No. 113-10 at 21. Inmate Request Forms, while not grievances *per se*, are still considered protected speech. *See*, *e.g.*, *Smith v. Perez*, No. 3:19-CV-1758 (VAB), 2020 WL 2307643, at *9 (D. Conn. May 8, 2020). But the record contains no evidence from which a reasonable jury could infer a causal connection between Plaintiff filing an inmate request form and Nurse Cruz allegedly denying Plaintiff's medical care, especially when the inmate request form did not allege any misconduct on behalf of Nurse Cruz and when it was Nurse Cruz's job, as HSAR Coordinator, to receive and respond to such submissions. *See* ECF No. 113-10 at 21 (responding to Plaintiff's inmate request form); ECF No. 113-10 ¶ 7 (outlining HSAR Coordinator's responsibilities). Although Plaintiff contends that Nurse Cruz treated him disrespectfully when he addressed this issue with her, that does not create a genuine dispute of material fact suggesting that she retaliated against him by not providing him with specialized medical care—to the extent it was even within her authority to do so—*because* he filed inmate request forms. Finally, to the extent that Plaintiff's theory is that Nurse Cruz retaliated against him based on the inmate request form complaining about his medical treatment (or alleged lack thereof) from Nurses Ortiz and Serwah-Konadu, "[t]he Second Circuit as well as other district courts within the Circuit have observed that it is difficult to establish one defendant's retaliation for complaints against another defendant." *Pedreira v. Pearson*, No. 3:24-CV-1875 (OAW), 2026 WL 2474685, at *7 (D. Conn. Aug. 24, 2026) (internal quotation marks omitted) (quoting *Dixon v. Lupis*, No. 3:20-cv-1754 (VLB), 2021 WL 4391246, at *9 (D. Conn. Sept. 24, 2021) (collecting cases))). Nothing in the record here supports the idea that Cruz retaliated against Plaintiff because of his complaints against Ortiz and Serwah-Konadu's provision of care.

Because a reasonable jury could not conclude that Nurse Cruz retaliated against Plaintiff for his exercise of protected activity, Nurse Cruz is entitled to summary judgment on the merits of this claim.

C. Qualified Immunity

The Court also concludes Defendants are entitled to qualified immunity for the alleged Eighth Amendment and First Amendment violations.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions[.]" *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 553 (2012)). Thus, "[t]he qualified immunity standard is 'forgiving' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) (quoting *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010)). "Qualified immunity is an affirmative defense on which the defendant has the burden of proof, either at trial or on a motion for summary judgment." *Johnson v. Perry*, 859 F.3d 156, 170 (2d Cir. 2017).

"When a defendant invokes qualified immunity to support a motion for summary judgment, courts engage in a two-part inquiry: whether the facts shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *Pearson,* 555 U.S. at 232). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."

*Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks and citation omitted). A court is "entitled to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Johnson*, 859 F.3d at 170 (cleaned up).

Because the facts in the record do not "make out a violation of a constitutional right," *Pearson*, 555 U.S. at 232, all Defendants are entitled to qualified immunity on the claims against them. *See Johnson*, 859 F.3d at 170 ("Summary judgment on this basis is available if, with the facts taken in the light most favorable to the plaintiff, the alleged constitutional right either was not violated or was not clearly established at the time of the alleged violation." ).

## IV. CONCLUSION

For the reasons discussed above, the Court **GRANTS** Defendants' motion for summary judgment, ECF No. 113, in full. The Clerk is directed to enter judgment for Defendants and close this case.

**SO ORDERED** at Hartford, Connecticut, this 30th day of September, 2026.

*/s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE